

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 02-12-00347-CV**

| | | |
|---|---|---|
| In the Interest of C.C.K. and C.S.K., Minor Children | § | From the 158th District Court |
| | § | of Denton County (2011-20180-158) |
| | § | February 7, 2013 |
| | § | Opinion by Justice Walker |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

By_____
Justice Sue Walker



## COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00347-CV

IN THE INTEREST OF C.C.K. AND
C.S.K., MINOR CHILDREN

----------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

This is an ultra-accelerated[2] appeal in which Appellant Mother appeals the termination of her parental rights to C.C.K. and C.S.K.[3]  In two issues, Mother

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights within 180 days after notice of appeal was filed).  We note that briefing was completed in this appeal on December 14, 2012, and that our opinion is required to issue on or before February 19, 2013, leaving this Court with less than seventy days to review

argues that the evidence is factually insufficient to support the trial court's best interest finding and that the trial court's statement to the jury that the jury was to consider only the issue of termination constituted de facto testimony of the judge as a witness in violation of Texas Rule of Evidence 605 and an impermissible comment on the evidence. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The voluminous twelve-volume reporter's record, including the exhibits, reveals that Mother has been struggling in multiple areas of her life—emotionally, mentally, relationally, and financially—for many years, as demonstrated by several incidents of domestic violence, a pattern of alcohol abuse that resulted in a variety of criminal charges, a history of CPS involvement, frequent job changes and periods of unemployment, reliance on others to pay her bills, multiple relocations, and the eventual loss of her home. Interlaced with these issues were the problems Mother faced in raising a son with behavioral issues and her repeated decision to resort to disciplining with physical abuse on numerous occasions. Because Mother challenges the factual sufficiency of the evidence to

---

approximately 1,800 pages of trial transcript and approximately 1,200 pages of exhibits and to draft, circulate, and issue this opinion.

[3]In accordance with Texas Rule of Appellate Procedure 9.8(b)(2), the opinion will refer to the children using the following aliases: C.C.K. will be referred to as Collin, and C.S.K. will be referred to as Carol. *See* Tex. R. App. P. 9.8(b)(2).

support the jury's best interest finding, we set forth the details of her struggles below.

## A. Mother's Background

Mother was thirty-two years old at the time of the termination trial and testified regarding her background. Mother had a felony charge for possession of a controlled substance in 1998. When asked about her illegal drug use during her 2009 psychological evaluation, she reported, "I used all of them until 2002. I've been clean since." She reported that the drugs she used most were heroin and speed, and it was noted that Mother had contracted hepatitis C from intravenous drug use. Mother moved to Temple, Texas, in 2002 to go to rehab.

Mother testified that she had identified herself as an alcoholic since before her children were born. Before her children were born, Mother drank to blackout level. She had attended Alcoholics Anonymous from 2002 to 2004. She then used church to maintain her sobriety.

Mother met Father at church in Temple in October 2003; he moved in with her, she got pregnant, and they married in October 2004. Mother smoked for the first four months of her pregnancy with Collin even though she knew that she was pregnant. Mother testified that she was clean and sober when she was pregnant. Records, however, from Collin's 2011 hospitalization at Cook Children's Hospital revealed that Mother "confirm[ed] to using drugs during pregnancy with [Collin]."

Three months after Father and Mother were married, while she was eight months pregnant, Mother noticed Father's "bizarre behavior." He was having delusional ideations while they were in bed, and his behavior scared her. Mother called Father's sister Jacki,[4] who came and picked her up and told her that Father had been diagnosed at age eighteen with bipolar disorder and later was diagnosed with drug-induced schizophrenia.[5] Mother did not return to Father until he admitted himself to the hospital in January 2005.

## B. 2005 Family Based Safety Services (FBSS) Case

At the time of Collin's birth in February 2005, Father was hallucinating in the delivery room while Mother was in labor, and then he was aggressive with Mother while she was recuperating from childbirth. The Department of Family and Protective Services (hereafter referred to as "the Department" or "CPS") thereafter received a referral regarding concerns about domestic violence in the home, Father's mental health, and Mother's lack of bonding with the child in the hospital.

Two weeks after Collin's birth, a caseworker came to Father and Mother's home; Father was not cooperative. Mother left with Collin and went to live at

---

[4]Although the record spells Father's sister's name "Jackie" in one place in the record, we use the spelling "Jacki," which is used consistently throughout the bulk of the record.

[5]Father's background included schizophrenia disorder, bipolar type; alcohol dependence; cannabis abuse; physical abuse of a child by history; borderline personality disorder; antisocial personality disorder; and involvement with CPS.

Jacki's house for two or three months. After that, Mother moved in with her aunt and uncle (Mike and Patty) in Denton; Father stayed in Temple. Mother's bonding was evaluated while she and Collin lived with relatives. Mother successfully completed FBSS services, Mother was found to be protective of her children, and the case was closed.

## C. Mother Reconciles with Father

Father started taking medication, was cooperative with CPS, and was making progress, so Mother reconciled with Father, moved back to Temple at the end of 2005, and chose a cosmetology school in Killeen.[6] Mother testified that Father was competent and a hard worker when he was on his medication. Mother completed cosmetology school and obtained her license.[7] Mother and Father bought a house in Morgan's Point and lived there for about six months.

## D. Father Chokes Mother; They Separate

In August 2006, Father choked Mother and banged her head on the floor during an argument over bills.[8] Collin was eighteen months old and was present in the room. Father was charged with assault–family violence. Mother left

---

[6]Ashton Moore, the CPS conservatorship worker who became involved in the case in March 2011, testified that Mother broke the safety plan by returning to Father when it was not safe.

[7]Father's stepfather testified that he loaned Mother $1,500 to buy beauty equipment.

[8]Mother testified that Father had not been physically violent with her until this episode.

Father and rented her own apartment in Temple. A month later, she found out that she was pregnant with Carol, but Mother remained separated from Father. Mother gave birth to Carol on May 15, 2007.

### E. Mother Reconciles with Father Again

Mother reconciled with Father in June 2007, and they moved to Denton as a family with Collin and Carol. Father was on his medication and treated Mother and the children well while he was on it.

### F. Father Slaps Mother; Mother Moves into Shelter

In August 2007, Father backhanded Mother in the face and broke her teeth while she was holding Carol. In October 2007, Father acted belligerently toward Mother and displayed behaviors in front of Collin that Mother did not want him to grow up with. Mother explained that Father had called Mother obscene names, that she had covered Collin's ears, and that Collin had screamed because he was scared. Mother left Father and moved into a shelter. Prior to leaving, Mother had gone to marriage counseling for three months.

### G. Mother Allows Father to Keep Children; Father Abuses Carol

After Mother moved into the shelter, she allowed Father to keep the children one weekend. When Mother went to pick up the children, the left side of Carol's face was bruised and swollen. Father said that Carol had fallen off the couch onto a toy, but Mother did not believe him because there were fingerprints visible on her face. Mother continued to question Father until he explained that Carol was hungry in the middle of the night and would not stop crying; Father

thought that slapping her "would work."[9]  Mother went back to the shelter and had them call the police; she obtained a protective order; and Father was ultimately convicted of injury to a child and placed on felony probation.  Mother also notified CPS, and a CPS complaint was initiated as a result of the incident.  Mother regretted having let Father keep the children for the weekend.[10]

## H.  Mother Divorces Father

Mother stayed at the shelter for two months before renting a duplex in Denton.  Mother's rent was paid by Hope, Incorporated, and she worked part-time and went back to school to become a dental assistant.  During 2008, Mother enrolled Collin in play therapy at the University of North Texas (UNT), and she started in counseling at UNT and read parenting books.  Mother also filed for divorce, which was final December 15, 2008.

## I.  Mother Spanks Collin and Leaves Bruises

In January 2009, CPS received a referral from Delaney Gregory, a former Head Start teacher with Denton ISD, involving bruises on Collin's bottom.[11]

---

[9]Mother testified that prior to this, Father had directed his anger toward Mother; he had never harmed the children.

[10]Mother could not recall whether she had asked Father about taking his medication before or after the incident.  When asked whether she would have let the children go with Father if she had known that he was off his medication, she said, "At that time, I probably would have."

[11]Within the first week that Gregory taught Collin, she noticed while Collin was in the bathroom that he had two distinct handprint marks on his bottom. Collin told her that Mother had spanked him.  On at least one occasion, Gregory

8

Mother testified that she had spanked Collin, who was four, too hard. Mother testified that she usually spanked three times with a wooden spoon, but during this incident, she had spanked more than three times and fewer than ten times. Mother said that CPS did not open a case but told her that the spanking constituted excessive discipline and that she needed to try other methods.

## J. Collin's Behavior and Physical Abuse Findings in 2009

Gregory testified that she taught Collin in spring 2009 and fall 2009 when he was three. Collin had numerous tardies and absences in fall 2009, some of which were due to not arriving until after 10 a.m.

Gregory said that Collin "seemed to go from one end of the spectrum to the other"; sometimes he would be very hyperactive, and other times he appeared lethargic and "spacey, like he just wasn't there."[12] Gregory described Collin as "a bright little boy" who had a lot of potential for learning and was capable of learning the basics, but "his behavior got in the way more than anything else." Gregory testified that Collin had a difficult time with authority, became upset easily, and then would "fly off the handle." He was not violent but could be very aggressive toward other children. Collin's behavior issues were significantly more difficult to deal with than the other children's in the classroom.

saw bruising on Collin's upper arm that resembled fingers having grabbed his arm, but Gregory did not recall asking for an explanation.

[12]Gregory noted that Collin always seemed hungry and asked for extra snacks.

Whenever Collin misbehaved, Gregory talked to him and put him in timeout. Collin had trouble staying in the timeout area, so a volunteer would stay with him. Collin required attention, repetitive instructions, and structured boundaries.

Mother seemed receptive to the information that Gregory provided regarding Collin and any discipline or other issues that Gregory had in the classroom. Although Gregory felt like Mother loved Collin, it appeared to Gregory that Mother was not always patient with Collin; she seemed exasperated and worn out.[13]

Gregory made a home visit to the relatives' home where the children and Mother were living.[14] Mother was present, but was curled up and did not seem to be emotionally present. Gregory went over how Collin was growing and things that needed work, but she did not feel that Mother connected with what she was saying. Gregory thought that Mother was under the influence of drugs, and Gregory's understanding was that was why they were staying with a relative.

---

[13]Mother testified that in July 2009, she had gotten into a car accident in rush-hour traffic, had lost her car, and her job. During this same time, she was trying to get in at MHMR so that she could get back on antidepressants, but MHMR had a waiting list. In the meantime, she was also seeking help through the People's Clinic of Denton. Mother was also seeking out help for Collin. Mother said that she was overwhelmed, depressed, and "stretched." Mother was not turning to alcohol or anything else for relief from her anxiety or depression; Mother felt like she had it under control at that time.

[14]It is unclear from the record why Mother was living with relatives during this time period; Gregory's testimony is the only mention of this.

Mother had told Gregory on a couple of occasions that she was having problems with drugs and that she was trying to get help.

## K.  2009 FBSS Case

Nicole Eleata Swan received the case in 2009 due to concerns of physical abuse of Collin by Mother.  The allegations were that Mother was physically abusing Collin and that she had been very stressed out by being a single parent and by Collin's behaviors.  Collin had bruises that were possibly inconsistent with the explanation Mother had given.

Swan had difficulty meeting with Mother; Swan was supposed to meet with Mother three times a month for three months but met with her only a handful of times.  When Swan met with Mother, Mother seemed frustrated with Collin's behavior in running around and not listening; she would yell at him, and it would take several times before he would stop.  Sometimes Collin was hyper—running around, climbing the stairs backwards or on the wrong side, not sitting at the table correctly—and other times, he would calmly play with his toys.

Swan observed one occasion when Collin was tied to his car seat with pantyhose.  Collin tried to get out by walking around with the car seat on his back.  Mother testified that she did not tie Collin to the car seat with pantyhose, but she admitted that she had previously buckled Collin in the car seat for timeouts until he started carrying the car seat around with him.  Mother later clarified that she had tied up Collin with pantyhose once; it was "a lie" that the

11

caseworker told about seeing Collin walking around with the car seat tied around his waist with pantyhose. Mother testified,

> You know, it just didn't work anymore. And I put [Collin] in his room in the car seat, and he pulled the sheets off of his bed and knocked over some bookshelves. So I brought him back downstairs, and I took him out of the car seat and I just let him go and he started destroying the living room. So I restrained him there.
>
> And it was difficult. He was crying. I was crying. And he was trying to bite me, trying to bite himself. And I didn't know how to handle it. And I was completely upset and so was he. So I thought if I could restrain him that he would be controlled. If I could restrain him without actually being near him, then I would be able to calm down and he would eventually calm down as a result of the control.
>
> So I tied his wrists together with pantyhose and I tied his ankles together with pantyhose, and the blood started to rush to his hands and ankles. When they started to turn purple, I took the pantyhose off of him. They were probably on him for five minutes. It doesn't take very long for blood to rush. And I immediately called 911 myself and explained to the police officer what I had done.

Swan informed Mother that restraining with pantyhose was not an appropriate form of discipline, and Swan worked with Mother on appropriate discipline measures for Collin.

Swan was concerned about Mother's mental health, and so Swan referred Mother to counseling, to in-home parenting, and to MHMR for an assessment. The referral for counseling was for Mother and Collin because Swan wanted the counselor to work on the relationship between Mother and Collin. Swan thought that the filial therapy provided by Molly Kuzmich would help Mother deal with Collin's behaviors, but Mother went only one time; she gave Swan reasons why she did not go, including her work schedule.

12

FBSS could have provided services for a longer period of time, but Mother was not following through with her services, and FBSS had received three new referrals in a short period of time. One referral involved Mother's mother, who came over to Mother's house extremely intoxicated, got into an argument with Mother, and threw a beer bottle against the wall or outside.[15] The second referral involved Mother's taking Collin to UBH, a behavioral health hospital, and mentioning that she had tied him with pantyhose to his car seat. The third referral involved bruising on the children. An investigator met with Mother and addressed the referrals while FBSS tried to get Mother to engage in her services.

### L. 2009 CPS Case; Children Removed

All of the referrals "seemed to be validated," so ultimately, the FBSS case was closed, a CPS case was opened, and CPS took custody of the children. Mother testified that she thought that more services could have been offered to her as a single parent; she did not feel like it had to come down to separating her from Collin in order to help the situation.

---

[15]Mother testified that in September 2009, she came home from work and found her mother drunk. Mother had heard from a friend that her mother was drunk when she went to school to pick up the children. Mother put the children to bed and then told her mother that she could no longer watch the children; Mother's mother became upset, stumbled to her car, and dropped her forty-ounce beer in the parking lot, waking the children. That was the first time that Mother had allowed her mother to watch her children. Mother described her mother as a "really bad alcoholic."

At that time, Swan had no concerns that Mother was abusing alcohol. Mother reported during her psychological evaluation in October 2009 that she drank alcohol occasionally, but she noted that she would only drink a glass of wine on occasion.

Lori Trulson, who served as a conservatorship worker for the children, testified that the children were initially placed in foster care and later placed with Patty, the children's great aunt.[16] The children were out of Mother's home for eight months, during which time Collin's behavior improved; Collin started on medication to help with his behaviors, and Patty had a lot of structure in her home, which Collin benefitted from.

The initial issues that Trulson identified to address with Mother were stability, inappropriate discipline, and staying on her medication for her mental health.[17] To address Mother's issues, the Department provided individual counseling, a psychological evaluation, parenting classes, an intake at MHMR, and couples' counseling to address co-parenting. Mother went through a twelve-week "love and logic" course and a basic needs parenting class. Mother also started on medication to help with her anxiety and depression. Mother owned a car and was able to take herself to appointments. Mother was "very cooperative" in working services in 2009 to 2010.

---

[16]Trulson saw in the records that Collin had to be moved from his initial foster placement because of his behavior; he was a danger to himself and others.

[17]Trulson testified that Mother had a problem staying on her medication; when Mother stopped taking her medication, instability and stress overwhelmed her.

## M. Mother Receives Children Under Monitored Return

By June 2010, Mother had worked her services and had made enough progress that the Department felt it was appropriate to return the children to her under a monitored return. Mother had rented a three-bedroom apartment and was employed full-time as a dental assistant. Mother felt ready for the children's return and felt like she had a handle, for the most part, on Collin's behavior.[18]

Trulson testified that during the eight months that Mother's children were in CPS care, she had worked five jobs.[19] During the monitored return, Mother lost her job because she had trouble getting to work on time. She said it was difficult to get a routine in place for Collin and that it was hard to get out the door in the morning. Once she "finally got the routine better," it was too late because she had been tardy too frequently to keep her job. Mother then took a job at a temp agency, but she was barely getting by financially. The Department paid for daycare and had to assist her with paying her electric bill. Mother's instability with her employment caused her problems in making timely rent payments. Mother was able to get food stamps and Medicaid, which helped with Collin's medication, visits to the psychiatrist, and regular doctors' visits. Mother testified that her primary issues during this time were financial issues but that she also

---

[18]Mother later admitted that she had not learned enough at the end of the this first case to handle things.

[19]Mother disagreed that she had five jobs during the monitored return.

needed to gain parenting and coping skills. Mother said that she worked on these issues but did not master them.

Mother discussed Collin's behavior issues with Trulson, who suggested that Mother use a behavior chart and a treasure chest to reward good behavior. Mother implemented Trulson's suggestions, which worked at times, but she noted that it was hard to be consistent "with everything that was going on." Mother did not recall having to restrain Collin during the monitored return, but she did recall having a problem with keeping him in timeout. Mother testified that she locked Collin in his room during timeout and that there was no child monitor in his room.

Collin and Carol reported to Trulson some of the discipline that they had received during the monitored return. Trulson went over the discipline policy again, and Mother signed the discipline policy again.

Trulson was aware of only two instances when Mother drank alcohol. Trulson did not testify regarding the first instance, which was reported to her by Patty. During the second instance, which occurred in November 2010, Mother was out drinking with a friend of hers, and he was supposed to drop her off at her residence. Instead, he drove to Frisco, and Mother somehow got out of the truck and called 911. The police brought her back to her house. Mother did not have the key to her residence, so she knocked on a neighbor's door. The neighbor called the police, and the police arrested Mother for public intoxication. Mother had the children as part of a monitored return at the time of this event.

16

Before the case was closed, Mother had an incident that she did not report to her caseworker; she drank to the point of passing out in a bar and woke up in the hospital. Mother's blood alcohol level was well beyond the legal limit. Mother testified that she was not drinking all the time, but when she did drink, she had a problem stopping. Mother described herself as a "binge drinker."

At the end of the six-month monitored return, the Department closed their case, and Mother received custody of her children. Trulson felt that Mother had internalized what she had learned in her classes but that sometimes Mother had trouble putting it into practice because of the daily stresses of getting kids to school and going to work.

### N. Collin's Behavior at Daycare and School

Christie Matthews, who previously served as director of Children's Lighthouse, a daycare, testified that Collin and Carol were enrolled in childcare on August 31, 2010, and stopped coming in April 2011. The daycare kept Collin after school and kept Carol all day. Mother received assistance from the State to help pay for childcare.

Mother told Matthews that Collin had been diagnosed with ADHD and oppositional defiant disorder (ODD) and that there was concern that he might have Asperger's Syndrome or bipolar disorder. Collin was on medications to help regulate his behaviors, and all of his medications were given at home. From August until December 2010, Collin did very well.

Collin's kindergarten teacher told Mother that Collin was the lowest progressing child in the classroom and that he could not keep his hands to himself. The teacher thought that he was overstimulated. Mother asked Collin's psychiatrist if he could put him on a less stimulating medication so that he could keep his hands to himself and be able to focus on his homework, and the psychiatrist changed Collin's medication from Adderall to Concerta in December 2010.[20] Collin experienced side effects from the medicine. For instance, he started picking scabs, twisting the hair on his head until it fell out of his scalp, and asking questions repeatedly. Mother testified that it took "a while to start, for it to build up in his system in order to bring it to full recognition."

Matthews described Collin as a very sweet boy with age-appropriate behaviors, but after the holiday break (which was after CPS had stopped monitoring and had closed the case), he started exhibiting aggressive behavior and went downhill. Matthews was aware that there was a medication change and admitted that it could have contributed to Collin's aggressive behavior. Matthews noted that Collin was hitting and scratching children, and on the bus, he was biting, kicking, spitting, talking back, punching, and displaying aggressive behavior toward the teachers. Collin did not respond to redirection; he usually had to be sent to the office for correction. Numerous times, the daycare called

---

[20]Also in December 2010, Mother said that she was having financial issues and could not pay her childcare bill or buy Christmas presents. Matthews took care of the $150 that Mother owed the daycare, and the daycare purchased Christmas presents for Collin and Carol.

Mother to come pick up Collin.[21]  Matthews contacted Mother about Collin's behavior, and Mother said that she would contact the doctor to have his medication changed.  Mother told Matthews that she would give Collin more medication than what the doctor had prescribed for the afternoon if he was having issues.  Matthews testified that it would be difficult to parent Collin twenty-four hours a day, seven days a week, even with his being medicated.

Matthews said that the children appeared to be fed and were clean; she did not have concerns about Mother's parenting.  Matthews thought that Mother loved Collin and that Mother was trying because she kept looking for solutions.

### O.  Mother Gives Collin the Wrong Medication

On February 21, 2011, Mother accidentally gave Collin her Wellbutrin instead of his Risperdal.  She said that it was early in the morning and that she was "half asleep like a robot," that she grabbed the wrong bottle, and that she gave him the wrong medication.  When Mother recognized her mistake, she called the school right away to have them check on Collin.

Gaye Robin Estes, the school nurse, testified that when she was alerted to the problem, she called Poison Control because Collin was "a little jittery."  Estes also called Mother and informed her that Collin needed to be taken to the

---

[21]Matthews later clarified that the only two times that Matthews documented the early pick-up were March 25, 2011, when the aggressive behavior plan was given, and April 14, 2011, after Collin scratched a child.

emergency room because the school could not care for him in his condition. Mother did not immediately come and pick up Collin.

CPS received a referral related to the Wellbutrin incident. Tina Harris, the investigator assigned to the case, gave Mother suggestions on how to prevent a mismedication from happening again.

### P. Collin Taken to Emergency Room for Hallucinations and Medication Changes

On February 26, 2011, Mother took Collin to Cook Children's Hospital because he was having hallucinations and had attempted to wrap a seatbelt around his neck. Collin's medication was changed three times while he was there, and he was released ten days later. Mother told the doctors that she did not believe that he was ready to go home because his medication had not been monitored long enough to make the assessment regarding whether he was ready to go back to regular school.

The day after Collin was released from the hospital, he bit a child, breaking the skin. That weekend, Mother followed the "love and logic" discipline protocol and grounded Collin from playing with his friends and restricted him from playing with certain toys.

### Q. Mother Charged with Injury to a Child for Biting Collin

During the following week, which was spring break, Collin had four incident reports in five days at daycare. Mother increased Collin's restrictions, and Thursday evening, he bit his sister. Mother talked to Collin about all the ways

20

she had tried to correct his behavior, told him about gentle touch and being considerate of others, and then warned him and bit him. Mother testified,

> I did it so that he could understand how he was affecting another child. And he was crying and I hugged him and I apologized. And in my mind at the time, it was a last-ditch effort so that he could comprehend what the seriousness of the matter was. It wasn't so that I could tear a chunk out of my child. I didn't haul off and beat the crap out of him. I just -- I thought developmentally it would work, but it wasn't.

Mother agreed that her bite was hard enough that it left bruises on him that were visible five days later.

Denton Police Officer Jason Kolba testified that he responded to an injury-to-a-child call on March 20, 2011, at the police department. Father had brought Collin to the police station because he was concerned about an injury that he had noticed on Collin when he had picked him up from a child visitation. Collin said that Mother had bitten him. Officer Kolba noted that the diameter of the bite was an inch and a half and that the bruise was yellow and purple. While at the police station, Father called Mother on speaker phone and asked her what had happened to Collin. She said that Collin had bitten Carol and that she (Mother) had bitten Collin to show him what it felt like. Officer Kolba filed an offense report against Mother for injury to a child[22] and made a report to CPS.

Harris received the referral relating to the biting and "a very significant bruise" and interviewed Collin. Collin said that he had bitten his sister and that

_____

[22]Mother was later arrested for the bite mark on Collin. Mother bonded out of jail after a few days, and the case was later no-billed by the grand jury.

Mother had bitten him.  Mother told Harris that she had bitten Collin because he had been biting children at school.  Mother admitted that she had not learned that tactic in the twelve weeks of her parenting classes and understood that it was not an appropriate form of punishment.

### R.  Daycare Puts Collin on Aggressive Behavior Plan

On March 25, 2011, the daycare put Collin on an aggressive behavior plan, which Matthews explained as a correction action plan to help Mother and Collin understand that they were serious about his behavior and that it needed to be corrected in order for childcare to continue.  Mother responded by saying that she would talk with the doctor.

### S.  Collin Not Properly Medicated

On April 14, 2011, Collin was "completely out of control at school," and the school alleged that Mother was not medicating Collin and was not following through with MHMR.

### T.  Mother Overmedicates Collin; CPS Removes Collin

Kelly Parish, a special education inclusion teacher, testified that on the morning of April 15, 2011, Collin came to school very lethargic and sleepy.  Collin's teacher asked Parish to come observe, and Parish found Collin asleep on the floor.[23]  Collin's teacher said that she could not wake Collin, so Parish tried to wake him up by tickling him.  Parish said that Collin's eyes "just kind of

---

[23]Parish had previously observed Collin between five and ten times and had noted that his behavior varied from being very sleepy and drooling to being very silly and out of control.

22

rolled back in his head." Parish was concerned that Mother had given Collin too much medication. Collin was carried to the nurse.

Estes tried to check Collin's pupils, but every time she opened his eyelids, his eyes rolled up. She tried to wake him but was not successful. During the period of time that Collin was in Estes's office after he was brought in, he eventually became less drowsy and was not drooling as much.

Estes tried calling Mother six or seven times and could not reach her, so she decided to call 911 because she did not know if Collin had been overmedicated, had taken the wrong medication, had bumped his head, or had a blood clot.[24]

Jason Peterson, a paramedic and firefighter with the Lake Cities Fire Department, testified that he responded on April 15, 2011, to a 911 call that was received at 9:16 a.m. about a child "not acting right" at Stevens Elementary School. He was told that Collin was lethargic and nonresponsive. When Peterson arrived at 9:20 a.m., Collin was sitting on a table; he was moving

---

[24]Although one of the side effects of Collin's medications is drowsiness, Estes testified that Collin's medication could not have made him sleep to the degree that he experienced; he could not stay awake, he could not walk, and he had to be carried. Estes testified that Mother had attempted in the past to have Estes medicate Collin in a way that differed from the doctor's orders, and Estes informed Mother that Denton ISD's protocol required a doctor's orders for the dosage to be changed. It appeared—based on the written instructions that Estes had received from Mother versus the prescription—that Mother was making "cocktails" in an attempt to adjust Collin's behavior. Estes said it was possible that Mother had received instructions over the phone from the doctor regarding changing Collin's medication.

around and was able to answer questions. Peterson did not consider the possibility of a medication overdose because Collin was not acting lethargic when he saw him; he was alert and oriented to his surroundings. Peterson testified that he had found abrasions; one on Collin's abdomen and two in his mid- to upper back area. Collin told Peterson that he had been dragged by another child on some carpet, which seemed like a plausible explanation to Peterson because the abrasions were consistent with rug burns. Peterson ultimately decided to take Collin to the emergency room.

During the transport, Collin told Peterson that Mother had spanked him with a wooden spoon and that when he asked Mother to stop, she did not. Peterson was not sure whether the abrasions on Collin's abdomen or back had come from a wooden spoon.

Harris, the CPS investigator, received a report that Collin was taken to the hospital by ambulance because the school was initially unable to wake him. Harris went to the hospital and saw Mother and Collin, who was awake and alert; Harris testified that the scene was completely different than what the school had reported. Harris tried to talk to Collin, but Mother would not let her.

Harris learned that Mother had been giving Collin incorrect dosages of his Risperdal medication; instead of giving him 1.25 milligrams in the morning and the evening, Mother was giving Collin 0.5 milligrams in the evening and 2.0 milligrams in the morning. When Harris confronted Mother regarding the incorrect dosages, Mother responded that "it evens out throughout the day."

24

Mother explained that Collin's behavior indicated that it was better to give him more medication in the morning because of his aggressive behavior. Mother said that Dr. Yaculic, the psychiatrist, was aware that Mother was giving the uneven dosages. During the same time frame, Mother gave Collin an additional pill because he had spit out one pill, but Mother was not sure which medication it was. The dosage of the medication that Mother gave Collin could have caused his death.

Due to concern about Mother's "continued poor choices," Mother's alcohol abuse, the poor discipline choice that she had made in biting Collin, the Wellbutrin incident in February, the Risperdal incident in April, and her prior CPS history,[25] and the "considerable safety threat that was presented" regarding Collin, CPS decided to take custody of Collin and to petition the court for custody of Carol.

Mother was very angry about the removal. She "felt misunderstood" and thought that she was being blamed for a lot of what was going on with Collin. She admitted that she had made poor choices and was not always as organized as she should have been. She said, however, that she had tried to communicate with school staff, the psychiatrist, and the hospital about what was going on with Collin. Mother explained that when Collin's medications were switched and

_____

[25]Mother's previous case was dismissed in October or November 2010, and the new case started in February 2011, which was cause for concern according to Harris.

25

continued to be switched, it caused "a lot of ups and downs in his behavior. And anybody that's not seeing the whole picture, all of the workings of what's going on, could easily misunderstand and misinterpret." Mother said that she wished that Collin had been able to stay in the hospital longer for more professional monitoring of the medication because it was hard for her to gauge what was correct for him and it was hard for her to describe what was going on with him; it was a lot for her to handle. She said that when Collin is not under care consistently for an extended period of time on that much medication with a diagnosis like his, there were going to be changes in his mood and behavior and how the medication affected him.

## U. Mother Is Arrested for Theft

Denton Police Officer Ryan Rigdon testified that he stopped Mother on June 8, 2011, because the asset protection team at Walmart had seen her stealing $31 worth of cosmetics. Carol was with Mother. Mother was arrested for theft under $50.

Mother testified that she had little money and did not know when she would receive her next paycheck. Mother explained that there was no excuse for her choice that evening; it was impulsive. She further explained that she was dating someone that she should not have been dating and that he was not necessarily a good influence. She said that stressful events had occurred; that she did not have a happy outlook at the time; and that she was angry, was bitter, and was making poor choices. Mother believed that her negative attitude could

26

have negatively impacted Carol and that the episode at Walmart emotionally damaged Carol. Following the incident, Carol went with Mother's friend John,[26] who took her to her great aunt Patty. Carol ultimately ended up in foster care.

## V. Mother Is Arrested for Multiple Offenses

Denton Police Officer April McDonough testified that on July 5, 2011, Toby called the police to report that his ex-girlfriend, Mother, had trashed his house. Officer McDonough arrived at 4:15 a.m. and noted that "there was stuff scattered all over the front room." Toby told Officer McDonough that he and Mother had gotten into an argument while she was intoxicated and that she had begun throwing his items all over the living room when she could not find her keys to leave. Toby was hit in the back with a cross, and Mother had broken Toby's eyeglasses and a wooden box in which he stored a coin collection. Mother had also picked up a rock and had thrown it at Toby's van, damaging the frame above the driver's window.

Thirty minutes after Officer McDonough left to prepare her report, she received a 911 call that Mother had returned to Toby's house. When Officer McDonough arrived at 4:57 a.m., Mother was there, and Officer McDonough smelled alcohol on Mother's breath and noted that her speech was slurred and that she "was having a problem standing." Officer McDonough performed the HGN test on Mother and concluded that Mother was intoxicated. Officer

---

[26]Mother later testified that she did not spend time with John on a regular basis because he was addicted to Oxycontin.

McDonough arrested Mother for public intoxication, assault (throwing the cross that struck Toby), criminal mischief, and interference with a 911 call (for intentionally unplugging the phone while Toby was attempting to call police).[27]

Mother realized that the officer had stopped her from getting a DWI by arresting her for public intoxication. Mother admitted that she had made several bad choices that evening. When the Department learned of Mother's arrest, they changed the goal to termination, and Mother was very upset.

Because a marijuana pipe was found on Mother during her July 5 arrest, Moore, the conservatorship worker, went to Mother's home two weeks later to administer a random drug test and to check out the home. Moore noted that there were wine glasses with partial amounts of wine near the sink. Moore saw pills on the counter that were not in a particular bottle and were not labeled,[28] as well as pills in unmarked baggies inside the cabinets. Moore testified that the pills would have been within the reach of the children if they had been living with Mother.

### W.  Mother Is Intoxicated at Buffalo Wild Wings in 2011

In 2011, Swan, the FBSS caseworker, saw Mother at Buffalo Wild Wings, watched her take a lot of shots, and noticed that she appeared "extremely

---

[27]Officer McDonough found a marijuana pipe in Mother's front pocket. Mother said that the pipe belonged to Toby and that she had taken it from him to irritate him. Mother was not charged with possession of drug paraphernalia.

[28]Mother explained that the pills were a sexual enhancer.

intoxicated" because she placed her head down on the bar like she was about to pass out. Mother approached Swan and said that she recognized her but could not place her; Mother was slurring her words. Swan pulled Mother aside, for confidentiality purposes, and explained how Mother knew Swan. Swan said that Mother told her that she did not like her and left the bar with a man.

Mother recalled the incident and said that she was "buzzed" but was not intoxicated to the point that Swan had described. Mother admitted that she was with Toby that night and that she knew he had a history of drinking and three DWI convictions. Mother agreed that it was bad judgment for her, as she was trying to remain clean and sober, to be hanging out with someone who had a drinking history.

### X.  Mother's Job Changes

Mother had a temporary job as an apartment assistant manager at Singing Oaks Apartments in March 2011. She lost that job because she had to take off time for Collin's hospitalization and the events that followed—biting a child at school, biting at daycare, and doctors' appointments. She then worked at both Smart Looks and Quik Cuts Fast Tans as a hairstylist. Mother was fired from Smart Looks and left Quik Cuts. Mother then worked at Smile Magic in Denton from September 2011 until April 2012.

## Y. Visits

Moore observed thirteen visits. During the first few visits, Moore noted that Carol had meltdowns that were three times as bad as Collin's. She would hit, scream, and swat at Mother. Carol was not in CPS care at this point.

During a visit in April 2011, Collin said that he wanted a funny face painted on his face, but Mother painted a vampire on him. Collin had a meltdown and cried because he wanted it fixed. Mother tried to fix it four times by adding extra blood drops or by making it extra dark, but it never translated into funny. After Mother's four unsuccessful attempts, Collin "shut down" and wanted to be alone. Mother had moved on by that point and was drawing butterflies and bracelets on Carol.

On May 6, 2011, Mother "kept getting onto" Collin for not correctly bouncing the ball to Carol; he was doing it correctly, only Carol could not catch it because of her age and the size of the ball. Mother started bouncing the ball harder at Collin and hitting him in the chin. Mother asked Collin why he was getting angry, and he ultimately said that he did not like it when Mother hit him with the ball. Mother also brought a puzzle to the May 6 visit for the children to work on, but Collin kept putting the pieces in the wrong place. So Mother took pieces out of his hand and put them in the correct place. Mother then started slapping pieces out of Collin's hand. Moore testified that she was concerned about physical abuse because these incidents showed how quickly Mother's

frustration escalated when Collin became even slightly defiant or annoying. Moore talked to Mother about implementing some new techniques.

During the May 27, 2011 visit, Mother started to use timeouts, but she was not using them appropriately because she left the children in timeout too long. Whenever the children became too big of a challenge to Mother, she "would just move on to something else and ignore the behavior and just let the kids do whatever they wanted." Moore said that Collin cannot be allowed to do whatever he wants because he will continue picking until he gets a response.

During the August 9, 2011 visit, Mother explained to the children why she had missed the previous visit. She said that she had to go to jail for biting Collin when he was not being good and blamed him for her going to jail. Moore interrupted the visit and told Mother not to talk about arrests.

During a visit later in August 2011, Mother had been asked not to talk about the children's impending move to Belton because Collin was very anxious about it, but Mother asked Collin if he had packed up all his things. Moore called Mother out into the hallway and threatened to end the visit if she continued talking about the move.

## Z. Children Live with Jacki

Father's sister Jacki, who lived in Belton, testified that CPS had contacted her in the fall of 2011 to care for the children.[29]  Her understanding was that it would be a temporary placement while Father and Mother worked on trying to get their life stable so that the children could be returned to them.

CPS decided it would be best for Collin to repeat kindergarten during the 2011 to 2012 school year.  When Collin came in the fall, he was on three prescriptions, but the psychiatrist later reduced him to two.  When the medicine went down, Collin was still able to control his behavior.  Collin saw a psychologist as well, but the visits tapered off at the end of the school year.

Jacki said that sometimes Collin would wake up fine and get ready to go; other times, he was defiant, and it was an effort to get him to go places.  Jacki used timeout to discipline Collin.  On one occasion, he was sent home from school for hitting a child.  He did well in school and played soccer.

Jacki described Carol as "real quiet and a little too grown up, more like a teenager, sometimes."  Carol tested Jacki at times and crossed her arms and rolled her eyes sternly.  Jacki used timeout for her, and she was okay after that. Carol took dance, did well in school, and did not have any trouble.

When Jacki saw Mother at visits, the only question that Mother kept asking Jacki was whether she had gotten the children on SSI; Jacki did not understand

---

[29]Mother and Collin had previously stayed with Jacki during the 2005 FBSS case.

why that was Mother's primary question.  After visits, Jacki noticed that Collin would "get a little more in trouble, . . . not following directions as much for a few days."  Jacki testified that the children never asked to see their parents; they were happy when they saw them, but they were not devastated if they failed to show up.

Jacki was not prepared to have the children long term, so they were moved to foster care at the end of the school year.

## AA.  Visits in Belton

While the children were living with Jacki in Belton, Mother traveled to Belton to visit her children; Rhonda Stinnett was the CPS worker who supervised the visits.  Mother initially told Stinnett that her visits were four hours long, that she was having visits on the weekends and at the park, and that she went to the family's home.  Stinnett looked into Mother's claims and determined that all visits needed to be in Bell County and under supervision in the CPS office.  Stinnett saw that Mother had cut and pasted emails and had changed the "to," "from," and "date" lines and that Mother was trying to manipulate her to get extra visits or things her way.  Stinnett said that she was afraid for her safety if they left the building during a visit and no other workers were around.  So Stinnett had a person come and witness her interactions with Mother so that there was no discrepancy or confusion.

Stinnett characterized her working relationship with Mother as "difficult" and said that Mother's behavior during the visits was not in keeping with the

33

required guidelines. Mother's behaviors included putting the children in timeout and not taking them out; whispering; talking about Father; telling the children that they were coming home with her; telling the children about her services; and opening up the door to where the caseworkers were, walking into that area, putting her hands on Stinnett, and raising her voice in Stinnett's personal space. By giving her children mints, Mother also disobeyed the rule that parents were not to give anything by mouth; this concerned Stinnett because she was aware of Mother's history of giving Collin the wrong medication. Stinnett gave Mother leeway despite the fact that Mother had abused the visitation parameters. Stinnett told Mother that if she had to redirect her a third time, then the visit would be canceled; no visits were canceled.[30]

Stinnett described the visits as "chaotic." Mother tried to engage the children in activities but was only able to give one child attention, which caused the other child to act out; both children wanted Mother's attention. When Collin acted out, Mother put him in timeout. One particular timeout, Stinnett went in to tell Mother to take Collin out of timeout because he was not supposed to be in for very long due to his age. Mother refused, raised her voice at Stinnett, and told Stinnett to allow her to parent and to leave the room.

---

[30]Moore initially testified that Stinnett had conducted herself in an appropriate manner. Moore later agreed that Stinnett was assertive and bossy and said that she would have intervened if she had known that Mother was being treated that way by Stinnett.

On one occasion when Mother was setting up her laptop to videotape the visit, Stinnett suggested how Mother could position the computer, and Mother slapped her hand.

During the March 7, 2012 visit, Mother massaged the children while licking her lips and closing her eyes; the children looked frozen, and Carol told Mother to stop. Stinnett went in and told Mother to stop, and Mother stopped immediately without any arguing. Stinnett believed that Mother was being sexually inappropriate with her children. Stinnett said that Mother was normally busy, but this particular time, she was very subdued and had a strange affect. Stinnett thought that Mother should be tested for drugs but did not have the authority to order a test.

During the visit on April 23, 2012, which was shortly after Father's funeral, Mother showed the children pictures of Father and whispered to them. Although the pictures were "happy pictures," Stinnett was particularly concerned because she had not received any information from the children's therapist saying that this was appropriate. Mother started crying, the children started crying, and Stinnett asked Mother to give her the pictures. Mother ignored Stinnett and put the pictures to the side where the children could see them. Collin and Carol started fighting over the pictures and then mentioned that their aunt had told them that they would be moving soon. Stinnett said, "[W]e never really got back to a good place with that particular visit, the children were upset."

35

Mother had some productive visits with the children when she praised them for their school work, asked them about their activities, read books to them, engaged them in songs, and cleaned up the room as a family. Mother brought in coloring books and kept them interested in coloring and stickers. She also brought in a plastic bowling set and inexpensive gifts. But when Mother brought activities like painting canvases, tie-dying, and making sock puppets, the children could only sit and watch; they did not interact.[31]

At the end of the visits, Collin was not receptive to Jacki's requests to put his seat belt on. Mother did not offer help and did not encourage Collin to cooperate. Mother would stand by her car and smile, which prolonged the visit.

Stinnett noted that the children seemed happy to see Mother at the visits. Stinnett sensed that Mother loved her children and that the children loved Mother.

---

[31]The jury watched a video of a visit that took place close to Halloween in which Mother brought a tie-dye kit. She had not read the directions beforehand and did not realize that the activity would take the full two hours; she told the children that she would bring it back another time. During the visit, Mother initially paid attention solely to Carol and her dolls, but during the latter half of the visit, Carol played by herself while Mother helped Collin spell and write words. Both children called Mother "Mom" and sat in her lap, but Collin did not return the hugs and kisses that Mother gave him. Mother praised the children for their manners and for their reports of good behavior at school. Mother was able to get the children's attention when they were fighting and explained how they could play together. But for the mostpart, Mother was unable to engage the children at the same time other than when she was serving them cupcakes.

### BB.  Mother Goes to Court on Charges Involving Toby

In December 2011, Mother went to court on the charges stemming from the incident with Toby, and she was placed on deferred adjudication community supervision for eighteen months.  The terms and conditions of Mother's community supervision included that she was not to have contact with Toby, that she was not supposed to drink alcohol, that she was to participate in the Change program, and that she was supposed to start the Change program within sixty days of the order, which was December 19, 2011.  Mother was also required to successfully complete within 181 days of the order the Domestic Violence Victim Impact Panel, to pay all costs of the panel, and to pay community supervision fees and other fines and fees.  Additionally, Mother was required to do eighty hours of community service restitution, beginning within sixty days of the order and doing at least four hours per week.

### CC.  Case Gets Extended

The termination trial was reset in February 2012.  Mother received a six-month extension.

### DD.  Mother Charged with Public Intoxication

Denton Police Officer Lisa Martin testified that on March 30, 2012, she saw a female walking down the sidewalk who appeared to be "extremely intoxicated" because she was walking unsteadily and had bounced off a nearby building once.  It was Mother; Mother told Officer Martin that her name was "Sandy." Mother eventually gave her correct name but did not spell her last name

correctly. Mother did not know her address. A man approached and said that he and Mother had met earlier in the evening and had fought, and he urged Officer Martin to allow Mother to go home with him. Officer Martin did not think that was a good idea because he and Mother had just met and had already had a fight and because Mother was intoxicated. Officer Martin arrested Mother for public intoxication because she was considered a danger to herself or others. The jury viewed the video from Officer Martin's dash camera, which contained the audio of Officer Martin's conversation with Mother and showed Mother being walked to the patrol car in handcuffs.

Mother testified that after she had finished an hour-long counseling session on March 30, 2012, with Vanessa Stabler during which they had talked about Mother's hope for a monitored return, Mother went drinking. Mother met a guy at a bar and got into a disagreement with him. Mother admitted that she was intoxicated and was in no shape to be walking to her home, which was fifteen minutes away by car. Mother went to jail that night and subsequently lost her job at Smile Magic.

Mother's decision to go drink after counseling in March 2012 triggered a motion seeking to revoke Mother's community supervision in her prior cases.

### EE. Mother's Counseling

Dr. Michelle Greer counseled Mother in May 2010 and in 2011. In May 2010, Mother came two times and then did not return.

Mother began seeing Dr. Greer for counseling again in July 2011. Mother made significant progress, but her progress was short term. Mother was very positive about Carol but described Collin as "very challenging," said he had quite a few behavioral issues, felt that he was uncontrollable, and wanted things to be better with him. Dr. Greer was struck by the fact that Mother said that Collin was struggling in foster care and that would prove that he was the problem, not her. Dr. Greer said this comment raised safety concerns for Collin.

Dr. Greer testified that Collin's behavior could stem from exposure to Mother's conduct. Dr. Greer said that an environment of domestic violence in a child's early years can have a negative impact on a child and his behavior. Dr. Greer said that an environment where there is substance abuse of prescription drugs or alcohol can also have a negative impact on a child's behavior.

Mother mentioned that the children were difficult in the mornings. Dr. Greer talked with Mother about a "kid-friendly" schedule and encouraged her to maintain some type of schedule even without the children so that she could address the issue of being on time for work.

Mother admitted to Dr. Greer that she had some prior substance abuse issues and that she had used alcohol and prescription medication in the last few years to cope when she was stressed. Mother reported that she had been involved in her aunt and uncle's church and was getting guidance and financial support there. Mother was "pretty untrusting" of others but felt that she could

create a support group through the church. At that time, she was meeting with several women who were mentoring her.

Dr. Greer testified that it concerned her that Mother had become intoxicated and was arrested because it demonstrated that Mother continues to make the same choices and to repeat the same behaviors. Dr. Greer was not sure whether Mother could be successful, but Dr. Greer thought it was a good choice for Mother to go into another residential program. Dr. Greer believed that Mother's desire to keep trying is a positive attitude, but it concerned her that Mother repeatedly made the same choices over extensive periods of time even with intervention.

Because Mother needed appointments that would not interfere with her work schedule, Dr. Greer referred Mother to Vanessa Stabler, who offered Saturday sessions.

Stabler, Mother's counselor from the end of October 2011 until April 5, 2012, testified that Mother met with Stabler sixteen times and seemed to be engaged in the sessions. Stabler said that the goals for Mother were to accept responsibility for her children being in CPS's custody, to refrain from any substance use or criminal activity, and to continue developing a support system.

Stabler discussed with Mother positive parenting approaches, appropriate consequences, how to discipline using timeout, how to follow through with her children, and how to develop and use positive coping skills for herself to decrease her stress and to help her be more attentive to her children. Stabler

worked with Mother on her self-indulgent behaviors. Mother made progress in this area by being more patient when working with the children and by setting more appropriate consequences. Stabler worked with Mother on finding resources to help her with Collin including filial therapy and books on handling children with ADHD. Stabler assessed whether Mother understood and processed the information that she was learning in therapy as Mother discussed her visits with her children and showed Stabler two two-minute videos from the visits.

While Mother was in counseling, some of the circumstances that she faced included losing her driver's license, having to pay extra fees, having to figure out how to manage on her own, and having to redevelop friendships that were positive and healthy. Stabler gave Mother examples of things that would help her relax and decompress.

Stabler said that Mother seemed to grasp her issues with substance abuse; she knew that because she had previously abused drugs, she could not use any kind of substance casually. Mother was involved in Celebrate Recovery and "was doing other things" to help her maintain her sobriety. Stabler testified that she did not have any suspicions that Mother was abusing alcohol. Stabler said that the March 30, 2012 public intoxication was a one-time relapse as far as she knew. It caused Mother to lose her job and to violate the conditions of her community supervision, and it did not help her situation with CPS.

41

Mother talked to Stabler about being overscheduled;[32] she was working full time, she attended counseling once a week, she attended Alcoholics Anonymous (AA) groups and Celebrate Recovery, she was involved with her support system at church, and she was undergoing intensive outpatient therapy. Stabler was aware that the Court-Appointed Special Advocate (CASA) and CPS wanted Mother to obtain a second job in addition to what was already on her plate; Stabler thought that was an unreasonable expectation. But Stabler believed that the services required of Mother were not over and above what CPS demands of its other clients. Stabler testified that "it's possible" that in trying to help Mother with services and overscheduling her, CPS had sabotaged Mother because she had a tendency to get overwhelmed in having to meet demands.

Stabler testified that her reports from October, November, and December said that Mother was making progress and doing fantastic. Mother also did well from July 2011 until April 2012. Stabler testified that Mother had not ever quit working towards getting her children back.

Stabler testified that following Mother's arrest for public intoxication, Mother was discharged from counseling because she went to rehab. At that time, Mother was still working on accepting responsibility for her children being in CPS's custody. She did not deny responsibility or give excuses but had not

---

[32]Moore also met with Mother when she was feeling overscheduled, and Moore went over how Mother could get her services done.

accepted full responsibility. Stabler said, "There was responsibility to the point where she did express guilt and remorse for the things that had occurred."

## FF. Father Commits Suicide

Father lost his struggle with his mental illness in April 2012. After Mother learned of Father's suicide, she went and drank alcohol and had sex with a man named Jesse, whom she had met at the probation office and had given her number; Mother initially denied all of this in her trial testimony and later admitted that she had not been honest with the jury.

At the request of Father's family, Mother was monitored at the funeral by Moore, who attended the funeral with Mother and the children. Mother was appropriate at the funeral service. The children wanted to be near Father's ex-girlfriend, and Mother handled that "okay."[33] Mother gave the children appropriate gifts after Father passed away.

Moore had concerns about Mother's mental health after Father passed away, and Moore contacted Stabler to make sure that she was accessible to Mother. Moore also informed Stabler that Mother had been "switching the words around" and had been "making the appearance to everybody on the outside that she relapsed after [Father] died." Moore wanted to make sure that Stabler

---

[33]Rachel Stevens, who had known Mother for a year through a Celebrate Recovery group at church, testified that she took Mother to Father's funeral and that the children were excited to see Mother but were unsure about the circumstances of why they were there. Stevens said that the children talked to Mother more than their "stepmother." Mother was nurturing and caring and answered the children's questions appropriately.

43

understood the time frame during which Mother relapsed. Mother took advantage of the additional counseling sessions that she was offered.

## GG. Mother's Services

In the current CPS case, Mother was ordered to attend weekly counseling sessions; to complete a drug and alcohol assessment and to follow all recommendations from the assessment; to attend weekly visitations with the children at the CPS office for two hours; to obtain employment and demonstrate employment stability; to obtain housing and demonstrate housing stability; to pay child support and medical support; to attend intensive outpatient; to attend residential treatment; to take a life skills class; to complete a healthy relationships course with Friends of the Family; to create a budget; to comply with MHMR's recommendations or the psychiatrist's recommendations; to complete random drug testing; and to refrain from criminal activity.[34] Mother was not asked to complete a psychological evaluation in this case because she had completed one in the 2009 case. Mother completed most of her services, though there was a delay in fully engaging in her services. Moore testified that the Department reviews compliance with a service plan as a whole.

Mother had been in counseling six different times since the children were born. Mother took a life skills class through counseling and completed a healthy relationships class.

---

[34]Mother also had conditions for her community supervision, which did not mesh with her CPS services, so Moore was not able to combine them.

Mother completed the drug and alcohol assessment but was still working on the recommendations at the time of the termination trial. Mother was asked to complete drug treatment based upon a recommendation from the drug and alcohol assessment. The initial recommendation was for supportive outpatient treatment, but after Mother was arrested, the recommendation was increased to intensive outpatient treatment, which she successfully completed. Mother also completed residential treatment following her relapse. Mother had participated in approximately six treatment programs, including the one that she was enrolled in at the time of the termination trial. Mother also attended Celebrate Recovery twice a week for five hours and attended AA and Narcotics Anonymous (NA).

Mother missed approximately three visits due to incarceration. Mother missed some visits in Belton because she could not afford to make the trip from Denton.

During periods of the case, Mother was compliant with maintaining housing and employment. Moore said that Mother was required to complete a budget for CASA but was not sure whether she had received a copy.

Moore believed that there was a three-month gap when Mother was not compliant with her medication and was not seeing a psychiatrist.

Mother's arrest in 2011 for criminal activity was in violation of her service plan.

Mother was not asked to complete parenting classes, but she completed an eight-week parenting course that she paid for. Mother had completed four parenting courses over the years.

### HH. Mother Starts Intensive Residential Treatment at VOA

Barbara Williams, a licensed chemical dependency counselor with the Volunteers of America LIGHT Program, testified that the LIGHT Program is an intensive residential treatment center for women and children. Williams testified that Mother came to the program in May 2012, after a lapse with alcohol, and Williams became her counselor later that month.[35] Williams testified that Mother had issues with time management, which affected her ability to maintain stable employment. Williams said that Mother is not lazy; Mother had been using her drawing and writing skills to work on the VOA's structure board, had created a budgeting spreadsheet for the residents, and had given all the residents free haircuts. Williams testified that Mother had worked the program and had "tried very hard."

Williams drug tested Mother three times. Mother had not slipped back into drinking while she was in rehab.

On July 27, 2012, there was an incident in Williams's office following a conference call to Mother's probation officer. Mother said that she had been

---

[35]Mother had to weigh the pros and cons of losing her home or going to rehab, and she chose rehab even though she knew that her children would not be returned to her. Mother's apartment complex filed suit to evict her while she was in treatment, and Mother lost her home in May or June 2012.

having a conversation with her probation officer about the difficulty of getting her community service lined up. Mother became upset and yelled at the probation officer and Williams. Williams and the probation officer confronted Mother about her behavior and told her that she needed to stop blaming others for her poor decisions. Williams asked Mother to leave her office and come back when she was calm and could listen. Mother later returned, and Williams spent quite a bit of time with her processing the situation.

Williams had helped Mother come up with a discharge plan in the event the jury returned the children to Mother. The discharge plan required Mother to obtain stable housing, attend NA or AA support groups, contact her sponsor daily for the first thirty days, and attend ninety twelve-step meetings in ninety days. Williams found Mother a place to stay at the Salvation Army's women's program, which would allow Mother to have her children with her and would provide a structured program to help Mother transition back to life without alcohol. Williams believed that the women's program at the Salvation Army would be best for Mother and her family to help Mother make the transition.

## II. Visits at VOA

Cindy Dinsmore, the program coordinator at the VOA LIGHT Program, testified that she had observed three of Mother's visits with her children. Dinsmore testified that Mother was very attentive and seemed organized; she planned ahead to have structured activities, as well as snacks and drinks, for her children during the visits. Dinsmore had never seen the children be disruptive

47

because Mother was so attentive and kept them focused on her activities. Dinsmore had not witnessed Mother spank the children or discipline them inappropriately. Mother exercised patience during the visits.

Dinsmore said that the children always run to Mother, are very excited to see her, and seem to have a good time at the visits. Dinsmore testified that the children appear to be bonded to Mother and that they love Mother.

### JJ. Children Moved to Ms. Debbie's

Ms. Debbie, the foster mother, testified that this is the second time that she has fostered Collin and Carol.[36] Ms. Debbie kept the children in 2011 before they went to their relatives' home for the 2011 school year.

In 2011, when Collin arrived at Ms. Debbie's house, he did not want to listen to rules; he bit or attempted to bite other children; he would hit or kick if he did not get his way or if he wanted something that another child had; he did not want to go to sleep; he did not want to sit at the dinner table; and he did the opposite of anything that he was asked to do. Ms. Debbie said that she would talk through his behavior with him when he received a warning. Ms. Debbie disciplined using timeouts and used a routine, consistency, and rewards to remold Collin's behavior. Ms. Debbie followed through with her promises in order

---

[36]Ms. Debbie had previously been a child care provider and a CPS worker in California. Ms. Debbie was not married and did not have a job. She received funds for fostering, as well as disability for disk issues in her back and neck. Ms. Debbie's home is licensed as a group home; she owns a 4,000-square foot home with seven bedrooms.

to build trust with Collin. Ms. Debbie also had a color chart for behavior, and beans were awarded for different tasks; after accumulating fifty beans, the child could choose a prize from the treasure chest. Collin's behavior improved; his outbursts were not as loud, and he became more cooperative.

Initially, Ms. Debbie went to Collin's school almost every day because he was not listening to his teacher. Ms. Debbie sat down with Collin, talked to him, and reinforced that the same rules from her home applied at school. Towards the end of the school year, Ms. Debbie was going to Collin's school less frequently.

When Carol arrived, she was withdrawn, whiny, and wanted things her way. By the end of August 2011, she was not as whiny and was more cooperative. Carol also responded to the systems that Ms. Debbie had in place for rewarding good behavior.

While the children were in Ms. Debbie's home during 2011, they received play therapy from Cindy Meyering. The children received play therapy separately at first and then together because Carol "was deathly afraid of being around" Collin and would scream when he walked by her. There was some progress, but they were still working on that at the time of the termination trial.

In May 2012, Ms. Debbie learned that the children were no longer going to be in a relative placement, and she asked for the children to come back and live with her. CPS returned the children to Ms. Debbie on June 2, 2012. Ms. Debbie said that she did not have to start back at ground zero with Collin; it was a lot

49

easier the second time. Ms. Debbie said that Collin is taking two medications now compared to the four he was taking when he came in 2011. She said that he is able to function better with less medication and more activities.

Ms. Debbie transported the children to and from visits because they were afraid that they would not come back to her house. Initially, Collin was upset after a visit with Mother, but he gradually became calmer with subsequent visits.

Ms. Debbie said that both children do well. Ms. Debbie said that they do classes and activities all week, that they go swimming, and that they go to the lake.

Ms. Debbie said that Collin and Carol are bonded to her and that she wants to adopt them. She loves them and believes that they are "great kids." Ms. Debbie said that if she adopts Collin and Carol, she will be the mother of ten children, four of whom are over age eighteen.[37]

## KK. Children's Counseling

Cindy Meyering, the clinical therapist who worked with the children while they were in Ms. Debbie's home, testified that when she first met Collin, he was "pretty wild," was quite suspicious, was emotionally agitated and frantic, and was testing the adults' limits. Collin was repeating kindergarten and was exhibiting a great deal of defiance, aggression, and an inability to pay attention; he was

---

[37]At the time of the termination trial, Ms. Debbie had three of her adopted children living with her, one was currently in trouble and was living at a residential treatment center; she also had two foster children living with her. Ms. Debbie also had three of her older, biological children living with her most of the time.

hitting people and was "having a real hard time managing his little childhood." Meyering testified that Collin demonstrated behaviors, actions, and speech consistent with a child who came from a home where his needs were neglected. When asked whether Meyering saw signs that Collin could have been the victim of physical abuse, she testified that she saw him hit quickly when he was around other children, that he refused to do timeout, that he was assaultive towards adults, and that it was very evident that he did not know how to keep himself safe—running with dangerous items and trying to run out the door. When Meyering first saw Collin, he was acting out aggressively with animals, which is a "pretty dangerous" indicator about the child and what he has experienced. Meyering testified that Collin's behaviors indicated that his early childhood experiences were chaotic. Meyering worked with Ms. Debbie to make it quiet and calm so that Collin would feel comfortable in his new surroundings. However, even with the counseling and the various strategies that Ms. Debbie has in place, Meyering testified that Collin still has problems.

When Carol was removed in 2011, she suffered from trauma and separation anxiety in not knowing where she was supposed to be. At the time of the termination trial, Carol continued to suffer with a fear of being disciplined; backrubs helped to calm her. Carol still exhibited "creepy" facial expressions or the "stink eye" in June 2012, which is concerning to Meyering because of the intensity of it and because Carol's eyes get very dark and laser in on a person. Meyering and Ms. Debbie have worked with Carol by asking her to describe her

feelings so that her words can match her face and so that she can have confidence in expressing what she needs to say without having to hold it in.

Meyering said that the visits with Mother do not appear to have much value to the children; they do not talk about them. Collin and Carol did not talk positively about Mother; they called her by her first name and mentioned things that had happened in her care. Meyering knew that Mother had a temper based on what Collin had told her. Collin repeatedly told Meyering that Mother had bitten him. Based on what the children had said, Meyering was concerned for the children's physical and emotional safety because she believed that Mother had physically abused the children.

Meyering described Ms. Debbie's home as a positive, healthy environment with a neat and orderly system. Both children showed visible improvement while they were in Ms. Debbie's home: they thrived in the motivational system that Ms. Debbie has in place to encourage good behavior; they were able to trust adults; they have a better sense of self-confidence; they make more positive decisions; and they adhere to the rules of the adults that they are with in social situations.

Meyering testified that the children require a lot of care; they "warrant a lot of different levels of attention." Meyering testified that the children need the stability, the structure, and the age-appropriate activities that Ms. Debbie's home provides, as well as the support of knowing where their refuge is.

Meyering believed that the children's relationship with Ms. Debbie is quite strong and that they are positively bonded. Collin and Carol have also become attached to members of the household.

### LL.  Mother's Status at the Time of the Termination Trial

During the trial, Mother completed the inpatient treatment program at VOA and enrolled in the Salvation Army's First Choice women and children's program, where she planned to stay for six months to a year. Mother believed that the Salvation Army program was better than living in an apartment because she would have supervision and professional counseling.

At the time of the termination trial, Mother did not have an attorney in her criminal case, which was set approximately two weeks after the termination trial. Mother was going to ask for an appointed attorney and was aware that the District Attorney's office was recommending extensive jail time, up to a year.

Mother testified that it is possible that she could be denied renewal of her dental assistant license and her cosmetology license once the licensing authorities learn of her criminal charges; she had not had to renew her licenses since she had received the charges. Mother's driver's license was not valid at the time of the termination trial because it had been suspended.

Mother testified that she was painfully aware of the mistakes that she had made as a parent. Mother agreed that the children had to deal with the turmoil of her mistakes. Mother testified that she was disappointed in herself and that her children were probably disappointed in her. She said that Collin is harder to mold

than a typical child and that it is going to take a lot of patience. Mother said that she has a lot of patience and does not lose her temper easily, despite the incident with Toby when she was intoxicated and the incident in her counselor's office. Mother agreed that she had already received the benefit of a village to help her raise her children. Mother testified that she had learned that she needs to engage more with people, that she needs to form a healthy support system, and that she needs to role model good behavior for her children. She had learned that she needed to not react by being "emotionally dramatic" but to process people's reactions with maturity.

Mother testified that she loves her children and that her children love her. Mother testified that she had accepted responsibility for her children coming into care; she said that her children had come into CPS's care because she was not managing her household, she did not have healthy relationships that are necessary for a good support system, she did not have a handle on time management, and she did not handle stress well. Mother believed that she could manage her household now.

Mother agreed that she got into trouble when she drank. Mother admitted that during the intensive outpatient treatment, she had trouble recognizing that alcohol is a drug. Mother testified that one thing that was different now is that she knows that there is no way that she can safely drink alcohol ever again, and that is what she is committed to.

54

## MM.  Testimony Regarding Mother's Parenting Abilities

Estes, the school nurse, believed that Mother was a bad mom sometimes. Estes elaborated that she thinks Mother has had a hard life, has made some hard choices, has not had a lot of support, and has not been able to do what she wanted to do for her children.  Estes believed that the lack of a support system and financial issues had impacted Mother's ability to parent.  Estes was not sure whether Mother loved Collin.

Father's stepfather testified that the children are the victims of two bad parents and that it is in the children's best interest to be adopted by their foster parent.[38]

Father's sister Jacki testified that Father had told her that the children would thrive better in a foster family.  Jacki said that she did not have trust in Mother.  Jacki did not know Mother very well and said that she based her opinions on what she had seen and heard.  Jacki did not believe that the timing was right for the children to be returned to Mother because she felt that Mother had not made progress as a result of the continued criminal charges.  Jacki testified that it was best for the children to be placed in foster care and adopted by someone who is able to spend time and energy with them.  Jacki believed that the children would thrive with Ms. Debbie because she is very organized and

---

[38]Father's stepfather had witnessed Mother grab Collin by the arm, pull him off his feet, and drag him across a concrete porch when he wanted to talk to a neighbor; Collin was five years old at the time.

very loving and caring; Jacki did not know if the children would thrive with Mother.

Dr. Greer's impressions of Mother are that she loves her children and is committed to them, is very outgoing, speaks very well, and has a lot of potential, but she lacks follow-through, possesses a lot of impulsivity, engages in a lot of alcohol use and unstable relationships, and demonstrates a tendency to put her own needs ahead of her children's needs. Dr. Greer said that Mother's dependencies could be very dangerous to the safety of the children. Dr. Greer testified that the termination trial exemplifies that Mother has had a difficult time in providing an adequate environment for her children. Dr. Greer testified that past conduct is a good indicator of future conduct and that Mother's past conduct is a strong, negative indicator of her ability to parent her children. Dr. Greer opined that Mother would continue to have CPS involvement over the years.

Stabler was not comfortable making a recommendation about whether Mother could parent on her own because she had not made enough progress during the time Stabler saw her and because Stabler had not seen Mother in the four months preceding the trial. But Stabler testified that a parent facing a lengthy jail term was not a sign of stability.

Williams, Mother's VOA counselor, testified that Mother could be a good parent of little children, even if one of the children has behavioral issues and even when Mother is having a bad day. Williams agreed that Mother could not be a good parent if she was off drinking rather than spending time with her

children and that Mother could not be a good parent if she was in jail for several months.

Jean Taylor, who ministered to Mother during the ninety days that she was at VOA, testified that Mother was different from the other women at VOA because she had "such a stability in her and a strength in her"; she was emotionally stronger and more determined than the other women. Taylor testified that she saw "a very big change" in Mother and that she seemed to be even more spiritually strong, confident, and sure of herself. Taylor said that Mother had made progress but was not perfect. Taylor believed that Mother is 100% ready, willing, and able to take care of her two children even though Collin has some special needs. Taylor believed that with some help, some guidance, and some accountability, Mother could be a good parent because she was willing to learn how to be a good confident parent.

Sherry Horton, who knew Mother from Celebrate Recovery, testified that in the three years that she has known her, Mother has made a lot of progress in being more transparent, more aware that she cannot do it by herself, and more open to saying that she needs help. Horton believed that the jury could feel good about returning the children to Mother.

Stevens, who knew Mother from Celebrate Recovery, believed that Mother was making progress and that Mother is a good mom and that she is ready, willing, and able to take care of her children with the proper assistance and resources.

## NN. Mother's Request and Plans for the Children

Mother testified that she adores her children and wants to be their mother. Mother said that she would do everything to meet her children's needs every day, that she was prepared to handle Collin's behavior, that she would not use physical discipline, and that she would do her best not to drink. Mother asked the jury to return her children to her; she was ready, willing, and able to provide them with a safe environment at the Salvation Army.[39] She believed that was in the children's best interest.[40]

Mother planned to complete her treatment at the Salvation Army and to seek employment. Mother said that her plan was to stay out of jail. She was hoping that the judge would reinstate her community supervision because she had already started working her community service; the Change program was no longer in existence; she had completed some of the other classes that had been asked of her; all of her payments were up to date until she went into treatment; and she was working with her probation officer to complete the remaining stipulations. If Mother goes to jail, she said that she would ask people from her church to take care of her children. But she had not lined up anyone because she "was counting on having [her] probation continued." Mother believed that

_____

[39]Mother later said that there might be some questionable characters at the Salvation Army.

[40]Mother testified that she was not asking for her children back in order to get Father's death benefits that they were entitled to receive.

CPS would become involved again if she could not find anyone to care for her children if she goes to jail.

Mother agreed that stability is important for her children and that it is not ideal for the children to stay in foster care until she is able to get her affairs in order. Mother, however, did not think the best plan would be for the children to be with Ms. Debbie while Mother becomes sober, obtains employment, and quits committing crimes. But Mother admitted that Ms. Debbie was in the best position to take care of her children right now.[41]

## OO. The CASA Volunteer's Observations and Recommendation

Sue Smith,[42] the CASA volunteer who had spent 500 hours on this case, testified that she had walked through the children's foster home environments, had talked to their teachers and the principal, had attended Collin's Admission, Review, and Dismissal (ARD) meetings, and had checked with the therapists and the parents to be able to document what is going on in the children's lives and to report to the judge.

With regard to Collin's school issues, Smith testified that Collin repeated kindergarten because he missed thirty-two days and was tardy eighteen times.

---

[41]Mother testified that she had met Ms. Debbie and was comforted that her children were in good hands.

[42]Smith is a mother of three, is a grandmother of four, has a bachelor's degree in elementary education with a minor in psychology, has a master's degree in education, and taught school for thirty-two years before she retired.

Smith had suggested that Mother call in to the ARD meeting and listen on speaker phone, but Mother did not, even though she was not working.

Smith observed twenty visits. Smith never saw an eagerness on the part of the children to see Mother; Mother had to ask the children to come and give her a hug. The children did not volunteer affection for Mother. There were visits when the children wanted to leave. Although Mother tried to bond with the children, they were not comfortable with the way that she tried to interact with them. Smith was not saying that the children do not love Mother; sometimes they do not like her.

Smith observed the visit on November 16, 2011, during which Mother put Collin in timeout because he would not say something nice about Carol; Mother left him there for six minutes, and Stinnett interrupted the visit. Mother became upset and told Stinnett that she could handle the situation. When Mother did not remove Collin from timeout, Stinnett interrupted again. Mother removed Collin from timeout after seven and a half or eight minutes had passed. Mother later told the children that Stinnett was "a mess." Smith watched a videotape of the visit, and it cut off before the inappropriate discipline; the videotape contained only the "good part of the visit."

Smith asked Mother to prepare a simple budget. Mother gave her a very detailed budget that she had prepared with the help of a church member. When Mother told Smith that she was looking for a second job, Smith encouraged Mother to get more hours at Smile Magic. By working only thirty-two hours per

60

week, Mother was not making enough to take care of her family's needs. Smith testified that Mother had six jobs in the fifteen months that she worked with her.

Smith agreed that Mother had, during her therapy, accepted responsibility for why her children were in care, but Smith never heard Mother acknowledge her mistakes and say that she did something wrong that caused her children to come into care. When Smith went to the rehab facility in June 2012 to observe a visit with Mother and the children, Mother said that she had talked in her support group about biting Collin and that the people in her group said that was not a reason to have children removed. Smith believed that Mother had slipped back into the "it-wasn't-my-fault" mode.

Smith encouraged Mother to stay out of trouble during the July 4 weekend and was disappointed when she later learned that Mother had gotten drunk and had been arrested for her actions at Toby's apartment. Mother's continued criminal activity was not a suitable environment for the children.

Smith believed that Mother was willing to provide the children with a safe environment but that she was not able to do so. Smith believed that the children were vulnerable to abuse or neglect because of their young ages; they did not have the capability to call someone when they were being disciplined improperly.

Smith testified that it was not in the children's best interest to ever live with Mother again. Smith was concerned about permanency for the children, which

was uncertain because Mother was facing possible jail time. CASA[43] recommended that Mother's parental rights be terminated based on over a year's worth of factfinding, including Mother's unstable employment, her criminal history, and the feedback on how the children were doing in foster care. CASA believed that terminating Mother's parental rights was in the children's best interest based on the lack of stability, the frequent job changes, the long periods of unemployment, the repetitive pattern of falling off the wagon, the time Mother spent in jail, and Mother's inability to independently care for the children.

## PP. The Department's Recommendation and Plans for Children and the Children's Counselor's Agreement Therewith

According to Trulson, the Department's workers did not feel like they could offer any other assistance or help to support Mother. Trulson testified that the Department's workers believed it was in the children's best interest for Mother's parental rights to be terminated. The Department's plan was for the children to be adopted by Ms. Debbie.

Moore testified that despite the fact that Mother had received treatment at VOA, the Department felt that termination of Mother's parental rights is in the children's best interest because the Department looked at the case as a whole and saw substantial history with the family, criminal history, and alcohol abuse. The longest that Mother had gone without inappropriate behaviors in the current

---

[43]Smith testified that CASA's decision was made by her and her supervisor Sandy Moresco.

case was six months, and in previous cases it was a year or a year and a half. Mother had continued to be impulsive and to make poor choices. Moore testified that it was in the children's best interest to have permanency. Moore testified that termination is the only way towards permanency for Collin and Carol.

Meyering testified that the Department's plan to ask for the jury to terminate Mother's parental rights and for the children to be adopted by Ms. Debbie is a positive plan. Ms. Debbie can provide the long-term stability that the children need. Meyering believed that Mother's plan to take the children to the Salvation Army with her to continue her outpatient substance abuse treatment would derail the children from the progress that they had made. Meyering also believed that if the children were returned to Mother, and she relapsed, it would have a severe negative impact on both children's futures and that it would increase a sense of hopelessness in the children, which could manifest itself in many negative ways. Meyering agreed, however, that it will be traumatic for the children to know that they will never see their parents again if Mother's parental rights are terminated.

## QQ. The Ad Litem's Recommendation

In the children's ad litem's closing argument, she asked the jury to make sure that the next ten to fifteen years do not look like the last seven years of the children's lives.

## RR. Jury's Verdict

After hearing the above testimony and reviewing the exhibits that were admitted, ten of the twelve jurors answered yes to questions one through six, finding that Mother had engaged in conduct or knowingly placed Collin and Carol with persons who had engaged in conduct that had endangered their physical or emotional well-being; that Mother had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that had endangered their physical or emotional well-being; and that termination of the parent-child relationship between Mother and Collin and Carol is in the children's best interest. The trial court thereafter signed a judgment terminating Mother's parental rights to Collin and Carol. This appeal followed.

### III. SUFFICIENT EVIDENCE SUPPORTS BEST INTEREST FINDING

In her first issue, Mother argues that the evidence is factually insufficient to support the trial court's best interest finding.

### A. Standard of Review

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2012); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a

reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B.  Presumptions and Best-Interest Factors

There is a strong presumption that keeping a child with a parent is in the child's best interest.  *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.  Tex. Fam. Code Ann. § 263.307(a) (West 2008).  The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

> (A) minimally adequate health and nutritional care;
>
> (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;
>
> (C) guidance and supervision consistent with the child's safety;
>
> (D) a safe physical home environment;
>
> (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and
>
> (F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

66

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## C. Best Interest Analysis

Here, with regard to the section 263.307(a) factors, the record demonstrates that, at the time of the termination trial, Collin was seven and a half and had been diagnosed with ODD, depressive disorder, symptoms of distractibility, lack of focus, and high levels of agitation; he was taking two medications to help with his behavioral issues. Carol was five and showed mild symptoms of separation anxiety, as well as some very mild symptoms of depression and oversensitivity. The CASA volunteer testified that because of

their young ages, the children were vulnerable and did not have the capability to call someone when they were being disciplined excessively. Mother testified, and Meyering agreed, that if Mother's parental rights were terminated, it would be detrimental to the children because they would lose both parents in a short time span.

With regard to the frequency and nature of out-of-home placements, the record details that the children were removed in October 2009 and placed in a foster home for a week before being moved to a relative placement with Patty. In April 2011, Collin was removed, and Carol was removed in June 2011; the children were placed with Ms. Debbie, then with their Aunt Jacki during the school year, and finally were placed back with Ms. Debbie.

The factual section above sets forth the magnitude, frequency, and circumstances of physical and emotional harm to the children; it shows that the perpetrators of the harm to the children were the parents; and it describes the history of abusive or assaultive conduct by the parents. In summary, the harm to the children included witnessing incidents of domestic violence between Mother and Father; Mother's tying Collin's hands and feet with pantyhose and leaving them tied until his hands and feet turned purple; Mother's giving Collin the wrong medication; Mother's giving Collin too much of his medication; Mother's biting Collin hard enough to leave teeth marks and severe bruising; Mother's spanking Collin excessively hard with a wooden spoon, which left substantial bruising; Mother's leaving the children with Father, during which time Carol was slapped;

Mother's leaving the children with her mother, who was drunk; Mother's exposing the children to Toby, who had three DWI convictions; Mother's incarceration for theft, which resulted in Carol's coming into CPS's care; and Mother's other incarcerations, which resulted in her absences from visits with the children and the loss of her job.

The children did not testify at trial, and so it is not clear from the record whether the children were fearful of living in or returning to Mother's home. The record contains conflicting evidence on the children's responses to their visits with Mother: there was some evidence that the children ran to Mother and enjoyed their visits, and there was some evidence that the visits did not mean much to the children, that they often wanted to end their visits early, and that they called Mother by her first name.

Collin's evaluation at MHMR in late October 2009 concluded with a diagnosis of ADHD–Combined/Hyper-Impulse. In February 2010, Collin's psychiatrist noted that he had ADHD and ODD. Collin's psychological evaluation from March 2010 contained a diagnosis of posttraumatic stress disorder, chronic; ODD; depressive disorder, not otherwise specified; and phonological disorder. The evaluation noted the family history of mental illness but stated,

> [O]f even greater concern is the significant physical abuse and emotional abuse that [Collin] has endured over the years. This is a child who has significant power and control needs. . . . It is likely that he looks to try to help control situations through the acting out behaviors as a way to have some sense of stability in an environment which was unpredictably threatening in the family of origin. He is a depressed, traumatized little boy who is engaging in

69

significant acting out. In the past, the mother was concerned regarding a possible attention deficit hyperactivity disorder. This evaluation does not support that disorder although it does recognize the symptoms of distractability, lack of focus[,] and high levels of agitation.

However, it is hypothesized that symptoms are more driven by the underlying depression and traumatization rather than a true attention deficit hyperactivity disorder.

Carol's psychological evaluation from March 2010, while she was staying with her great aunt and uncle, revealed a diagnosis of separation anxiety disorder and adjustment disorder with depression. Carol exhibited some mild symptoms of depression and oversensitivity, but for the most part, she "seem[ed] to be managing relatively well."

The results from Mother's October 2009 psychological evaluation revealed that Mother was diagnosed with adjustment disorder "with mixed disturbance of emotions and conduct, chronic and severe and major depressive disorder, recurrent." The psychological evaluation also revealed that Mother had a history of opioid abuse and amphetamine abuse, that she had been the victim of physical abuse and sexual abuse, that she had problems related to interactions with the legal system/CPS, that she lacked a primary support group, that she had problems related to the social environment, and that she had occupational and educational problems. Mother's history of instability had created emotional issues, including trust issues that limited her ability to form healthy relationships. Mother's psychological evaluation stated,

70

Individuals with similar testing results are generally immature, narcissistic, and self-indulgent. They often make excessive and unrealistic demands on relationships. Such individuals tend to seek attention and sympathy to access. Such individuals are often suspicious of others. They resent demands made upon them, and they often experience relationship problems. Individuals are mistrusting of the motivations of others and tend to avoid close emotional involvement.

Individuals with similar testing results are often hostile and angry. They are resentful of authority figures. Such individuals often deny serious psychological problems through rationalization and transferring blame to others. They have difficulty accepting responsibility for their own behavior. Such individuals can be somewhat unrealistic and grandiose in their self-appraisals. They are often unreceptive to psychotherapy.

During her psychological evaluation, Mother admitted to a history of substance abuse prior to 2002, and the record revealed that Mother had continued to struggle with alcohol abuse throughout the case.

Six different times since the children were born, Mother had been in counseling. Concerns about Mother's honesty were noted during counseling.

With regard to the willingness and ability of Mother to effect positive environmental and personal changes within a reasonable period of time, the record revealed that Mother had completed school for two certificates of employment (hairstylist and dental assistant), that she had been able to secure places to live, that she had been able to secure a vehicle,[44] and that she had made some progress in therapy and her current treatment program. Mother knew how to get help and resources; she received help from several churches

---

[44]Mother had a car at the time of the termination trial, but it was broken.

and from relatives. But the record also revealed that Mother had made poor choices throughout the time that the case was pending and that she was still in the process of making changes and had not fully transitioned back to life on her own. During the termination trial, she completed her inpatient treatment at VOA and enrolled in a program at the Salvation Army, where she planned to stay for six months to a year if she did not receive jail time at her upcoming community supervision revocation hearing. Mother had not shown that she could fully effectuate changes or maintain them long term.

With regard to Mother's parenting skills, Matthews, the daycare director, testified that the children appeared to be fed and were clean, but the record also revealed that Collin was always hungry and asked for extra snacks when he was at Head Start and that he ate treats from the secretary when he was in school because he was very hungry. Mother appeared to care deeply for the children, but she did not know how to appropriately discipline Collin when he misbehaved, as evidenced by the pantyhose incident, the spankings with the wooden spoon, the biting incident, and the lengthy timeout during a visitation. While the children were in foster care, pills for sexual enhancement were found on Mother's kitchen counter that would have been within the children's reach. Mother had attempted to limit the children's exposure to domestic violence by leaving Father, but then she allowed the children to stay with Father and also did not keep her temper in check. Mother struggled to demonstrate an understanding of the children's needs and capabilities as she often brought activities—such as painting

canvases, tie-dying items, and making sock puppets—that they could not participate in but could only watch.

Mother lacked an adequate support system for most of the case, but three people testified in her behalf at the termination trial that they would support her going forward.

With regard to the *Holley* factors, the children's desires were unknown because they did not testify at the termination trial. Although the children appeared to love Mother, the record indicates that they would prefer to live with Ms. Debbie. They did not mention wanting to see Mother, they called Mother by her first name, they had bonded with Ms. Debbie and her other children, and they thrived when they were not living with Mother.

The children's key emotional and physical needs are a stable, secure, predictable, and consistent environment. Mother had not shown that she was able to meet these needs consistently due to her alcohol abuse, which resulted in criminal charges and eventually unemployment and homelessness. Collin in particular needed a home with stability, structure, and predictability, but Mother's frequent incarcerations and rehab impeded her ability to meet his needs. Mother's psychological evaluation revealed her narcissistic tendencies, and the record as a whole demonstrated Mother's inability to put her children's needs above her own.

The emotional and physical dangers to the children were many. Due to their young ages, the children were vulnerable and could not defend themselves

against Mother's physical abuse and excessive discipline incidents. Mother had exposed the children to domestic violence and to inappropriate caregivers, including Father, her mother, and Toby. Mother had not shown an ability to stay sober and to obey the law for any sustained length of time.

Mother arranged for her counseling office to set up parenting classes and paid for them on her own to demonstrate to CPS that she wanted her children back. Mother, however, struggled to implement the parenting skills that she had learned in her many courses. She continued to use excessive physical discipline, despite twice signing a form stating that she would not do so; she did not use timeouts properly; she chose activities that did not allow the children to participate; and she struggled to engage both children at the same time.

Mother had been through a variety of programs and services through her FBSS and CPS cases. At the time of the termination trial, she had completed a ninety-day inpatient rehab treatment program at VOA and was transitioning to a program at the Salvation Army. She had not transitioned back to life on her own and still needed accountability. She planned to continue attending Celebrate Recovery. Mother was resourceful in getting help and was seeking it out on her own.

Mother's plans included having her children move in with her at the Salvation Army while she completed more rehab there over a six- to twelve-month period. She planned to pay off her fines and seek employment. But Mother's plans were not carved in stone because Mother faced the potential of

jail time; a hearing on the State's motion to revoke Mother's community supervision was set to occur a few weeks after the termination trial. The Department's plan was for the children to be adopted by Ms. Debbie.

Unlike Mother, Ms. Debbie was not facing possible jail time but instead could provide a structured, stable home for the children with consistent, appropriate discipline and rewards. She did not work and therefore had time to dedicate to the children's therapies and needs. Meyering testified that the children need the stability, the structure, and the age-appropriate activities that Ms. Debbie's home provides, as well as the support of knowing where their refuge is.

With regard to the acts or omissions that indicate that the existing parent-child relationship is not a proper one, we have thoroughly detailed Mother's alcohol abuse, her criminal charges and incarcerations, her inappropriate excessive discipline tactics and physical abuse of the children, her decisions to leave the children with inappropriate caregivers, her overmedicating and giving the wrong medication to Collin, her homelessness and unemployment, and her approaching revocation hearing that could result in additional jail time. Mother testified that no one failed in their efforts to help her. However, at one point, she blamed her work schedule for her inability to make some of her appointments; said that she was still working the CPS program as well as doing classes through CPS and working back in December, which is why she was unable to start her community service hours; and blamed Collin and the school for her prior job

losses. Williams testified that Mother also blames the treatment center, probation officers, and CPS when she gets upset.

Giving due deference to the factfinder's best interest finding, without supplanting the factfinder's judgment with our own, and after reviewing the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that termination of the parent-child relationship between Mother and Collin and Carol is in the children's best interest. *See In re M.R.*, 243 S.W.3d 807, 820–21 (Tex. App.—Fort Worth 2007, no pet.) (holding evidence factually sufficient to support best interest finding because parents exposed children to domestic violence and drug abuse, mother had failed to obtain housing and employment, and children flourished in foster care); *In re J.L.C.*, 194 S.W.3d 667, 675–77 (Tex. App.—Fort Worth 2006, no pet.) (holding evidence factually sufficient to support best interest finding because although mother had attended parenting classes and was attempting to overcome her drug addiction, mother had difficulty putting her child's needs ahead of her own; had exposed child to drugs when pregnant and continued to use after child was removed; was involved in a life of crime, unemployment, homelessness, and addiction; and could not provide a stable home). Although contrary evidence exists in the record—that is, evidence that not terminating Mother's rights would be in the children's best interest—in light of the entire record, the disputed evidence is not so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its best interest finding. We overrule Mother's first issue.

76

## IV. TRIAL COURT DID NOT VIOLATE RULE 605 OR IMPERMISSIBLY COMMENT ON EVIDENCE

During the questioning of Ms. Debbie, she was asked, "If [Mother's] rights are not terminated, would you still be willing to keep the kids?" The Department objected based on relevance. The trial court overruled the objection. The Department asked to approach, and the trial court excused the jury and held a bench conference. The Department explained that although their pleadings encompassed a variety of alternatives, they were seeking only termination and had consistently objected to anything outside the scope of termination. Mother's counsel stated that if the Department was going to abandon a portion of their pleadings, they needed to do so in front of the jury or else it would unfairly prejudice Mother. The Department responded that it had already made it clear through their witnesses and that Trulson had already testified that the Department was not seeking any sort of managing conservatorship or "joint sort of co-parenting." The trial judge stated his intent to inform the jury that the Department was proceeding solely on termination, and Mother objected outside the presence of the jury, arguing that the issue of custody had been tried by implied consent. The trial court overruled Mother's objection.

The trial court made the following statement when the jury returned:

I'm going to go ahead and address the jury at this time to make it abundantly clear. The State has elected, and had elected prior to trial, to proceed on termination only. So there are no other alternatives that will be in front of the jury other than termination of parental rights.

77

In her second issue, Mother argues that the trial court's statement in front of the jury—"So there are no other alternatives that will be in front of the jury other than termination of parental rights"—constituted de facto testimony of the judge as a witness in violation of Texas Rule of Evidence 605 or an impermissible comment on the evidence.

### A. No Rule 605 Violation

Texas Rule of Evidence 605 states that "[t]he judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point." Tex. R. Evid. 605. "The question should be whether the judge's statement of fact is essential to the exercise of some judicial function or is the functional equivalent of witness testimony." *Hammond v. State*, 799 S.W.2d 741, 746 (Tex. Crim. App. 1990)[45] (quoting 27 Wright & Gold, Federal Practice and Procedure: Federal Rules of Evidence § 6063 (1990)), *cert. denied*, 501 U.S. 1259 (1991).

Here, the trial judge's statement did not convey factual information not in evidence. Nor did the trial judge's statement seek to rebut any evidence adduced at trial. Instead, the trial judge's statement told the jurors what they would be asked to decide and was akin to a preview of the jury instructions that would be given at the conclusion of the trial—all of which would focus on

---

[45]The Texas Supreme Court has relied on the Texas Court of Criminal Appeals's interpretation of rule 605. *See, e.g.*, *Bradley v. State ex rel. White*, 990 S.W.2d 245, 248 (Tex. 1999) (citing *Hensarling v. State*, 829 S.W.2d 168, 170 (Tex. Crim. App. 1992)). We do likewise.

termination, not custody or conservatorship. Under the circumstances, we hold that in instructing the jury that there would be no alternatives other than termination before the jury, the trial judge acted within his judicial capacity to give jury instructions. The trial judge's instruction was not "the functional equivalent of witness testimony," nor did it "convey factual information not in evidence." *See In re M.E.C.*, 66 S.W.3d 449, 457–58 (Tex. App.—Waco 2001, no pet.). The trial judge thus did not testify. Because the trial judge did not testify, but instead acted in his judicial capacity in giving a jury instruction,[46] we hold that he did not violate rule 605. *See* Tex. R. Evid. 605; *Hammond*, 799 S.W.2d at 746 (statements in furtherance of essential judicial functions are not testimony); *Newsome v. State*, No. A14-88-00067-CR, 1989 WL 6927, at *1–2 (Tex. App.—Houston [14th Dist.] Feb. 2, 1989, pet. ref'd) (not designated for publication) (holding that judge's comment was merely an instruction to the jury to disregard the appellant's attorney's previous testimony); *accord In re A.L.W.*, No. 02-11-00480-CV, 2012 WL 5439008, at *11 (Tex. App.—Fort Worth Nov. 8, 2012, pet. filed) (mem. op.) (holding that trial judge's statement—that it was important for

---

[46]We likewise note that the trial court was under no duty to give a jury instruction on conservatorship. When the controlling question in a case is termination of parental rights, as it is here, the trial court does not abuse its discretion by refusing to submit jury questions on conservatorship. *See Ayala v. Tex. Dep't of Family & Protective Servs.*, No. 03-09-00121-CV, 2010 WL 3672351, at *4 (Tex App.—Austin Sept. 16, 2010, no pet.) (mem. op.) (holding that trial court did not abuse its discretion by refusing to submit jury questions concerning conservatorship because controlling question in case was whether mother's parental rights should be terminated).

the jury to see Mother's behavior at the table during the trial—was not testimony because he did not testify regarding disputed facts in the case). We overrule the portion of Mother's second issue pertaining to a possible rule-605 violation.

### B. No Comment on Evidence

Within her second issue, Mother also argues that the trial court's instruction to the jury constituted an impermissible comment on the evidence.

A trial court has significant discretion in expressing itself while exercising control over the conduct of the trial. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240–41 (Tex. 2001). A trial judge's statement during the course of trial impermissibly comments on the weight of the evidence if it "indicates the judge's opinion concerning a matter to be determined by the jury." *M.E.C.*, 66 S.W.3d at 458.

The prohibition against commenting on the evidence has its primary application in the context of the jury charge. *Id.* Rule of civil procedure 277 provides that "[t]he court shall not in its charge comment directly on the weight of the evidence . . ., but the court's charge shall not be objectionable on the ground that it incidentally constitutes a comment on the weight of the evidence . . . if it is properly part of an instruction or definition." Tex. R. Civ. P. 277. Although rule 277 concerns the court's charge, appellate courts have applied the principle expressed therein to a court's verbal statements. *M.E.C.*, 66 S.W.3d at 458.

Having reviewed the record, we hold that the trial judge's instruction did not "indicate[] the judge's opinion concerning a matter to be determined by the

80

jury"; it did not tell the jurors that they were required to terminate but rather that termination was the only alternative that was being tried. The trial court thus did not violate rule 277's prohibition on commenting directly on the weight of the evidence. *See* Tex. R. Civ. P. 277; *Harris v. Gen. Motors Corp.*, 924 S.W.2d 187, 188 & n.1 (Tex. App.—San Antonio 1996, writ denied) (determining that trial judge's jury instruction—"In order to answer this question yes, you must find that Irma Harris was wearing the driver restraint system of the Camaro at the time of the occurrence in question"—was not improper under rule 277). To the extent the trial judge's statement encompassed his ruling on the questioning that took place prior to the bench conference, the trial judge's ruling is also not a comment on the evidence. S*ee Rosales v. State*, 932 S.W.2d 530, 539 (Tex. App.—Tyler 1995, pet. ref'd) (holding that trial court's verbalizing to the jury his ruling— "Ladies and gentlemen, you will disregard any testimony whatsoever about court orders. No consideration whatever about what was done or not done by reason of court order"—was not a comment on the weight of the evidence). We therefore overrule the remainder of Mother's second issue.

## V. Conclusion

Having overruled Mother's two issues, we affirm the trial court's judgment terminating Mother's parental rights to C.C.K. and C.S.K.

SUE WALKER
JUSTICE

PANEL:  WALKER, MEIER, and GABRIEL, JJ.

DELIVERED:  February 7, 2013